# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| IN RE: DIRECT MEDIA POWER, INC., <br><br> Debtor. <br><br> DIRECT MEDIA POWER, INC., and DEAN TUCCI, <br><br> Appellants, <br><br> v. <br><br> RADIO ONE, INC., <br><br> Appellee. | 18 C 7397 <br><br> Judge John Z. Lee |

## MEMORANDUM OPINION AND ORDER

Direct Media Power, Inc. ("DMP") filed for Chapter 11 bankruptcy in 2016. The case was converted to a Chapter 7 bankruptcy in 2017 and subsequently dismissed. At the time of dismissal, the bankruptcy court retained jurisdiction to rule on a pending motion for civil contempt that had been filed by creditor Radio One, Inc. ("Radio One"). The bankruptcy court granted the motion in 2018 and later awarded Radio One its attorneys' fees and costs associated with the contempt proceedings. DMP and its president, Dean Tucci, now appeal the bankruptcy court's contempt ruling and award of fees and costs. For the reasons stated herein, the Court affirms the decisions of the bankruptcy court.

## Factual and Procedural Background[1]

### I. The Cash Collateral Orders

DMP filed for Chapter 11 bankruptcy in November 2016. SA 1. The following month, the bankruptcy court entered an order ("the First Interim Order") authorizing DMP to use cash collateral during the bankruptcy on an interim basis, subject to certain conditions. SA 9–10. Namely, the First Interim Order permitted the use of cash collateral for "only those categories of expenses listed on" a budget provided with the order. SA 9–13.

Pursuant to § 341 of the Bankruptcy Code, a meeting of DMP's creditors was held on January 5, 2017. SA 1339. At the meeting, Tucci testified that DMP had not filed tax returns for 2014 or 2015. SA 1356 at 18:13–20. Based on this and other concerns, creditor Radio One filed an objection to DMP's motion seeking a second interim order authorizing the use of cash collateral ("the Second Interim Order"). SA 14–18. The bankruptcy court granted DMP's motion on January 12, 2017, but imposed certain additional conditions. SA 19–20. Specifically, the bankruptcy court required DMP to submit to Radio One "bank statements for any bank account that it utilized within [the] past twelve months," "reports from its accounting software to include weekly income statements and detailed transactional reports for the post-filing period," and "all invoices and receipts in its possession or control that substantiate the post-filing transactions." SA 19. In addition, DMP was ordered to submit to an examination pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure. SA 19.

---

[1] In their opening and reply briefs, DMP and Tucci cite the "Record on Appeal," ECF No. 6. That version of the record, however, is not consecutively paginated, making it difficult for the Court to discern to which pages DMP and Tucci refer. Accordingly, the Court's record citations refer to the "Supplemental Appendix" ("SA") provided by Radio One, *see* ECF No. 11-1. DMP and Tucci raised no objection to this version of the record in their reply brief.

2

As directed by the Second Interim Order, Tucci testified at the Rule 2004 examination on January 31, 2017. SA 1558–1681. Tucci stated that he "didn't set up [any] safeguards" to ensure that the budget approved by the bankruptcy court was being followed, and that the way he operated the company had not changed since the filing of the bankruptcy petition. SA 1630 at 73:12–17, 1631 at 74:8–10. He also testified as to a number of transfers made between himself, DMP, and the affiliated companies he owned, both before and after the entry of the First and Second Interim Orders. SA 1601–04, 1607–11, 1619, 1621–24, 1631–38.

The following week, on February 6, 2017, the bankruptcy court issued a third cash collateral order ("the Third Interim Order"), placing additional restrictions on DMP. SA 24–25. The Third Interim Order prohibited DMP from using any bank account owned by DMP, DMP Teleservices (a d/b/a of DMP), or Teledebt Solutions, Inc. (another entity in which Tucci had an ownership interest), other than "the Bank of America account ending in #6530." SA 24. The Third Interim Order also prohibited DMP from "making any transfers to affiliate companies or companies owned in whole or in part (directly or indirectly) by Dean Tucci." SA 24. Finally, the Third Interim Order provided that DMP "shall not pay any expense or otherwise use, transfer, or expend any of [its] funds without prior written approval from" Radio One's counsel. SA 24–25.

A week later, on February 13, 2017, the bankruptcy court issued a fourth cash collateral order ("the Fourth Interim Order"), further limiting DMP's ability to use cash collateral. SA 29–30. The Fourth Interim Order included the restrictions from the previous three orders and added that DMP must attest under oath that its funds were being transferred to and from only the #6530 account. SA 30. Additionally, it required DMP to provide Radio One's counsel with weekly reports showing all transactions from the preceding two weeks involving the #6530 account and

3

another account ending in #7452. SA 30. DMP was also required to close another bank account and "transfer all remaining [DMP] funds into the #6530 account." SA 30.

The bankruptcy court expressly "retain[ed] jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of" the First Interim Order, Second Interim Order, Third Interim Order, and Fourth Interim Order (collectively, "the Cash Collateral Orders"). SA 9, 20, 25, 30.

## II. The Contempt Proceedings

Radio One filed a motion for civil contempt on March 8, 2017, seeking dismissal of the bankruptcy case due to DMP's and Tucci's alleged violations of the Cash Collateral Orders. *See* Case No. 16-36934 (Bankr. N.D. Ill.), ECF No. 95. The bankruptcy court set a hearing for March 9, 2017, which was then continued to April 19, 2017. SA 34. In the meantime, the bankruptcy court entered an order imposing restrictions on the use of cash collateral in accordance with the Fourth Interim Order, and prohibiting DMP from expending any assets or diverting sales to other entities. SA 35–36.

DMP objected to the motion for contempt on March 24, 2017, arguing that it had been in substantial compliance with the Third Cash Collateral Order and that dismissal would be inappropriate. SA 59–66. Based upon the parties' agreed motion, the bankruptcy court again continued the hearing on the motion for contempt until May 3, 2017. SA 136.

Tucci appeared for a second Rule 2004 examination on April 27, 2017. SA 296–414. He testified that there were certain inaccuracies in the monthly operating reports he had provided to the bankruptcy court, and that he had signed the reports even though he did not believe them to be accurate. SA 327–34.

Several days later, on May 2, 2017—the night before the hearing on Radio One's motion for contempt—DMP filed a motion to convert the case to a Chapter 7 bankruptcy. SA 149. The

4

bankruptcy court granted the motion, and a Chapter 7 trustee was appointed. Case No. 16-36934 (Bankr. N.D. Ill.), ECF Nos. 131, 132.

On June 28, 2017, the bankruptcy court granted Radio One leave to file an amended contempt motion. Case No. 16-36934 (Bankr. N.D. Ill.), ECF No. 151. Before the motion was filed, the trustee filed a motion to dismiss the bankruptcy case on July 11, 2017, stating that the bankruptcy estate was "administratively insolvent." SA 152–57. Radio One then filed its amended motion for contempt on July 14, 2017. SA 159–71.

DMP and Tucci filed a brief in opposition to the motion for contempt, arguing that if the bankruptcy court were to grant the trustee's motion to dismiss, it would no longer have jurisdiction over the motion for contempt. SA 430. The bankruptcy court disagreed and dismissed the Chapter 7 case on September 20, 2017, expressly "retain[ing] jurisdiction over the request by Radio One, Inc. for contempt against [DMP] and Dean Tucci." SA 444.

Radio One was again granted leave to file an amended motion for contempt, which it did on October 10, 2017. SA 446–59. After the motion was fully briefed, the bankruptcy court held a hearing on December 5, 2017. Case No. 16-36934 (Bankr. N.D. Ill.), ECF Nos. 188, 190. Subsequently, on March 29, 2018, the bankruptcy court granted the motion. SA 730–45.

Radio One filed an application for attorneys' fees and costs on April 12, 2018, seeking $221,102.50 in fees and $35,050.62 in costs. SA 746. DMP responded, opposing any award but, alternatively, arguing that Radio One was at most entitled to a total award of $3,801.56. SA 758. Radio One then revised its request to $207,287.50 in fees and $35,030.34 in costs. SA 1319. The bankruptcy court ruled on the fee application on September 28, 2018, awarding Radio One $132,632.50 in attorneys' fees and $6,906.50 in costs. SA 1687.

In response, DMP filed a motion to alter or amend the judgment awarding fees and costs, SA 1333–37, which the bankruptcy court denied for failure to comply with the court's Local Rule 9013-1(C)(5). SA 1338. This appeal followed.

## Legal Standard

In reviewing bankruptcy court decisions, the Court reviews questions of law *de novo* and factual findings for clear error. *See Kovacs v. United States*, 739 F.3d 1020, 1023 (7th Cir. 2014). A finding of civil contempt is reviewed for an abuse of direction, *In re Taylor*, 793 F.3d 814, 818 (7th Cir. 2015), and such a finding will be reversed on if it "depends on faulty legal premises [or] clearly erroneous factual findings." *Harrell ex rel. NLRB v. Am. Red Cross, Heart of Am. Blood Servs. Region*, 714 F.3d 553, 556 (7th Cir. 2014).

## Analysis

DMP and Tucci raise several issues on appeal: (1) whether the bankruptcy court had jurisdiction over the motion for contempt after the Chapter 7 case was dismissed; (2) whether the bankruptcy court violated the Due Process Clause when it disallowed discovery or an evidentiary hearing on the motion for contempt; (3) whether the amount of fees and costs awarded to Radio One was an abuse of discretion; (4) whether the bankruptcy court's acceptance of Radio One's hourly rate was an abuse of discretion; and (5) whether the bankruptcy court erred in not allocating the award between DMP and Tucci. *See* DMP's Stmt. of Issues on Appeal at 2, ECF No. 6.[2]

---

[2] The Statement of Issues on Appeal also raises the issue of "whether the bankruptcy court erred as a matter of law in finding that the language of the Cash Collateral Orders was sufficiently specific and unequivocal to find that DMP's and Tucci's conduct amounted to a knowing violation of those orders." *See* DMP's Stmt. of Issues on Appeal at 2. However, DMP and Tucci have apparently abandoned this argument, as it is not raised in their briefs.

## I. Jurisdiction Over the Motion for Contempt

DMP and Tucci first contend that the bankruptcy court lacked jurisdiction over Radio One's motion for contempt after the dismissal of the Chapter 7 case. They argue that "Radio One's attempt to litigate what [was] principally a fraudulent conveyance and veil piercing action (among 6 other additional claims), under the guise of a 'civil contempt' motion, did not fit within [the bankruptcy court's] limited jurisdiction[.]" DMP's Opening Br. at 14, ECF No. 10. In response, Radio One argues that "because the [b]ankruptcy [c]ourt had jurisdiction to issue" the Cash Collateral Orders, "it retained jurisdiction to enforce and/or punish the violation of such orders even after the dismissal of the original proceeding." Radio One's Resp. Br. at 12, ECF No. 11. And, Radio One points out, DMP's and Tucci's argument that the contempt proceedings were an attempt to litigate various other claims is belied by the fact that the bankruptcy court sanctioned them only for conduct that violated the Cash Collateral Orders. *Id.* at 13–14.

It is well-settled that a bankruptcy court has authority to enforce its own prior orders. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009). Section 105 of the Bankruptcy Code broadly authorizes a bankruptcy court to take "any action . . . necessary or appropriate to enforce or implement court orders or rules." 11 U.S.C. § 105(a). And as the Seventh Circuit has recognized, this jurisdiction is not destroyed by the dismissal of the underlying bankruptcy action, because "a court has . . . 'clean-up' jurisdiction . . . to take care of minor loose ends." *In re Sweports, Ltd.*, 777 F.3d 364, 367 (7th Cir. 2015). Such "loose ends" may include the imposition of sanctions. *See In re Dental Profile, Inc.*, 446 B.R. 885, 890 (Bankr. N.D. Ill. 2011).

The bankruptcy court's ruling on Radio One's motion for contempt discussed the issue of jurisdiction extensively, concluding that "a court may have continuing jurisdiction to resolve the controversy between parties despite the court's prior order dismissing the bankruptcy." SA 731.

7

That conclusion is supported by *Sweports*, where the Seventh Circuit stated that "[a] court loses jurisdiction over a case when it issues a final judgment, which is to say a judgment that resolves the controversy between the parties," only to conclude that an order dismissing the bankruptcy case "didn't do that" when a claim for fees was outstanding. 777 F.3d at 367.

The same is true here. The order dismissing DMP's Chapter 7 case did not resolve the controversy between DMP, Tucci, and Radio One, because of Radio One's outstanding motion for contempt. Strangely, DMP and Tucci apparently recognize that the bankruptcy court had continuing jurisdiction over matters relating to the Cash Collateral Orders, stating that the court's jurisdiction as to such matters was "unquestionably well-founded." DMP's Reply Br. at 4, ECF No. 12. They argue, however, that this jurisdiction was somehow destroyed because the bankruptcy court "did not merely address whether money was spent in violation of [the] Cash Collateral Orders." *Id.* at 1.

True, the bankruptcy court's order on the motion for contempt discusses other issues in addition to the violations of the Cash Collateral Orders. For instance, the court stated that the Rule 2004 examinations in this case "gave rise to a number of discoveries, including (i) Tucci and DMP's operations without compliance with the duties and constraints of being a debtor in possession, (ii) Tucci's manipulation of cash and debtor and nondebtor bank accounts, (iii) Tucci's use of cash collateral for his personal gain, and (iv) use of cash collateral to pay prepetition debts." SA 734. But the Court fails to see how the bankruptcy court's discussion of what it viewed to be some of the broader issues during the bankruptcy case could somehow strip the court of its jurisdiction to determine whether DMP and Tucci violated the Cash Collateral Orders.

DMP and Tucci also argue that the bankruptcy court failed to state whether "any specific transaction violated an order," which (according to them) demonstrates that the contempt

8

proceedings were not really about the Cash Collateral Orders at all. DMP's Reply Br. at 2. But the bankruptcy court's order specifically mentions several such transactions. For instance, the court stated that, even though the Third Interim Order prohibited DMP from using any bank account except for that ending in #6530, "Tucci transferred $14,000.00 from . . . [an] undisclosed DMP account" to an account in Teledebt's name, "in direct violation of the Third Interim Order." SA 736. And, the bankruptcy court found, "Tucci transferred funds from DMP" and other affiliated entities "to his own personal bank accounts in direct violation of the Cash Collateral Orders." *Id*. As an example, even after the Fourth Interim Order had been entered, $2,600.00 was transferred from DMP to a personal account owned by Tucci. *Id*. As the bankruptcy court recognized, "[e]ven if" this transfer was "properly accounted for an authorized purpose, Tucci still violated the prohibition on using other bank accounts owned by DMP." *Id*.

In short, the bankruptcy court plainly had jurisdiction to interpret and enforce its own Cash Collateral Orders—in fact, it explicitly retained jurisdiction over all matters arising from those orders. And the bankruptcy court's dismissal of the underlying bankruptcy did not divest it of such jurisdiction, because the dismissal did not resolve the controversy between the parties and Radio One's motion for contempt was still outstanding. Furthermore, contrary to DMP's and Tucci's position that the bankruptcy court exceeded its jurisdiction in the course of the contempt proceedings, the court sanctioned DMP and Tucci only for violations of the Cash Collateral Orders. Accordingly, the Court concludes that the bankruptcy court properly exercised jurisdiction over the motion for contempt—a "loose end" that remained after the dismissal of the underlying bankruptcy case.

## II. The Due Process Clause

DMP and Tucci next argue that they were not afforded due process in the bankruptcy court. Specifically, they contend that they were not permitted to obtain discovery, that they were not given a proper hearing, and that they were entitled to a jury trial on the issue of civil contempt.

Civil contempt sanctions "may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994). In some cases, "[d]ue process may entitle the parties to discovery and an evidentiary hearing to the extent necessary to resolve relevant factual disputes." *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 459 (7th Cir. 1993). However, there is no right to a jury trial in the context of civil contempt proceedings. *Int'l Union*, 512 U.S. at 827.

DMP's and Tucci's argument that they were not permitted to take discovery in this matter is not supported by the record; instead, *both* parties participated in discovery prior to the final hearing on the motion for contempt. SA 51–53, 70–71, 114. Indeed, the parties filed an agreed motion to continue the contempt hearing, stating that they "ha[d] conducted expedited discovery" and seeking additional time "to complete any necessary written and oral discovery." SA 70–71. Although DMP and Tucci now point to certain discovery they were "not allowed to obtain," there is no indication in the record that they ever sought such discovery in the bankruptcy proceedings. DMP's Opening Br. at 17. And the only party that filed a motion to compel discovery during this process was Radio One. SA 51–54.

DMP's and Tucci's contention that the bankruptcy court failed to provide them with an evidentiary hearing sufficient to resolve the factual disputes in this matter is equally baseless. In fact, the bankruptcy court was keenly aware of its obligation to provide DMP and Tucci with a fair

opportunity to present their side. As the bankruptcy court explained in its order on the motion for contempt:

> The court . . . heard argument on the First Contempt Motion on March 9, 2017 (the "Emergency Hearing"). Despite appearing on an expedited, emergency basis, Radio One came to the Emergency Hearing showing that they had prepared well in advance, including large, professionally prepared demonstrative exhibits. Were the court to have proceeded with the Emergency Hearing on such an uneven footing, DMP would have been denied substantive due process on the matter in question. The court therefore refused to entertain the exhibits or the bulk of Radio One's request at the Emergency Hearing.

SA 737.

To provide DMP with equal footing, the bankruptcy court continued the hearing; in fact, at least three additional hearings were held on the motion for contempt. SA 737–39 (discussing hearings held on May 3, September 20, and December 5, 2017). And it is clear from the record that DMP and Tucci were given notice of these proceedings and an opportunity to respond; indeed, they twice filed response briefs in opposition to the motion and subsequent amended motion. SA 430–43, 1693–1708.

Still, DMP and Tucci contend that the bankruptcy court should have held an additional evidentiary hearing to resolve certain factual disputes. But the mere existence of a factual dispute does not require an evidentiary hearing; rather, as the Seventh Circuit explained in *D. Patrick*, such a hearing is required only "to the extent necessary to resolve relevant factual disputes." 8 F.3d at 459. In the context of contempt proceedings, failure to provide an evidentiary hearing does not constitute a denial of due process when the documentary evidence provided by the parties is sufficient to establish the contemptuous conduct. *See Commodity Futures Trading Comm'n v. Premex, Inc.*, 655 F.2d 779, 782 n.2 (7th Cir. 1981). As noted above, here, DMP's and Tucci's violations of the Cash Collateral Orders were clearly established by the documentary evidence and testimony.

11

The Court also notes that it is not clear from the record—or, at least, from the parts of the record cited by the parties—that DMP and Tucci ever requested that the bankruptcy court hold an additional evidentiary hearing. Indeed, in their response in opposition to the second amended motion for contempt, DMP and Tucci argued *against* holding such a hearing. SA 1699 ("No evidentiary hearing is necessary.").

Finally, although DMP and Tucci argue that they were entitled to a jury trial to resolve whatever factual disputes there were, there is no right to a jury trial in the context of civil contempt proceedings. *Int'l Union*, 512 U.S. at 827. For these reasons, DMP's and Tucci's due process argument is unavailing.

### III. The Fee Petition

#### A. Radio One's Counsel's Hourly Rate

Turning to the fee petition, DMP and Tucci argue that the bankruptcy court abused its discretion in "fail[ing] to conduct a proper assessment of the reasonableness" of Radio One's request for attorneys' fees "based upon evidence of prevailing market rates." DMP's Opening Br. at 19. They contend that Radio One was required to present evidence of the prevailing market rate for attorneys' fees beyond its attorney's own affidavit, but failed to do so.

A reasonable hourly rate is one that is "derived from the market rate for the services rendered," *Denius v. Dunlap*, 330 F.3d 919, 930 (7th Cir. 2003), and an attorney's actual billing rate is presumptively the best measure of the market rate for his services. *See People Who Care v. Rockford Bd. of Educ.*, 90 F.3d 1307, 1310 (7th Cir. 1996). An attorney seeking fees bears the burden of proving that his requested rate is reasonable; once he does, the burden shifts to the opposing party to present evidence that a lower rate is appropriate. *Pickett v. Sheridan Health Ctr.*, 664 F.3d 632, 640 (7th Cir. 2011); *Gautreaux v. Chi. Hous. Auth.*, 491 F.3d 649, 659–60 (7th

Cir. 2007). If a fee applicant fails to establish his market rate, a court may independently determine the appropriate rate. *Montanez v. Simon*, 755 F.3d 547, 553 (7th Cir. 2014).

DMP and Tucci contend that the bankruptcy court incorrectly based its fee award on the affidavit of Radio One's attorney, Stephen Rosenfeld. It is correct that an attorney's "self-serving affidavit alone cannot satisfy the [applicant's] burden of establishing the market rate for that attorney's services." *Spegon v. Catholic Bishop of Chi.*, 175 F.3d 544, 556 (7th Cir. 1999); *see also Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984) ("[T]he burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community."). But here, Radio One did not merely present an affidavit stating that the requested rates were reasonable; it also provided billing records showing the rates charged to the client. SA 751–55. And, the affidavit attests that Radio One actually paid those rates. SA 1330. "The best evidence of the value of [a] lawyer's services is what the client agreed to pay him." *Assessment Tech. of WI, LLC v. WIREdata, Inc.*, 361 F.3d 434, 438 (7th Cir. 2004). Numerous courts have concluded that where the client has actually paid the attorney at the requested rate, the rate is presumptively reasonable. *See, e.g.*, *Consol. Paving, Inc. v. Cty. of Peoria, Ill.*, No. 10-cv-1045, 2013 WL 2431260, at *2 (C.D. Ill. June 4, 2013) ("Plaintiff adequately showed the presumptive market rate by demonstrating it had actually paid the requested rate."); *Mostly Memories, Inc. v. For Your Ease Only, Inc.*, 594 F. Supp. 2d 931, 934 (N.D. Ill. 2009) ("These rates were fully paid by [the defendant], and are thus presumptively appropriate to use as the market rate."); *Sand Capital VI LLC v. Dickler*, No. 16 C 2865, 2017 WL 3008277, at *5 (N.D. Ill. July 14, 2007) (concluding that evidence of the client's payment to the attorneys at the requested rates "ma[de] the fees *prima facie* reasonable"); *Entm't Software Ass'n v. Blagojevich*, No. 05 C 4265, 2006 WL 3694851, at *3 (N.D. Ill. Aug. 9, 2006) (rejecting argument

that "self-serving affidavits" were insufficient to establish market rates where the plaintiffs "actually paid counsel at these rates").

Accordingly, the bankruptcy court did not abuse its discretion in concluding that "the hourly rates actually charged by its counsel . . . and actually paid by Radio One [are] . . . market rate[s] and presumptively reasonable under the circumstances." SA 1683. And because, as the bankruptcy court explained in its order on the fee application, DMP and Tucci failed to rebut the presumption of reasonableness, the bankruptcy court properly accepted the rates requested by Radio One's counsel.

## B. Block-Billing

Next, DMP and Tucci contend that the bankruptcy court abused its discretion in applying a 10% reduction to address issues with "block-billing" in Radio One's fee petition. They argue that because Radio One "presented multiple entries in its fee application together, without any principled basis to determine whether the amount of time spent was appropriate," the court should have "den[ied] the block billed time." DMP's Opening Br. at 21. Radio One responds that "bankruptcy courts routinely apply a 10% reduction to address block-billing issues." Radio One's Resp. Br. at 20.

In its order adjudicating the fee petition, the bankruptcy court explained that courts "prohibit parties from 'lumping' tasks together into single time entries," and that each task performed must be listed with a corresponding time allotment. SA 1684. The court further stated that "[l]umped tasks are customarily penalized by a ten percent penalty (rounded up to one-tenth of an hour)." *Id*. Because the timesheet submitted by Radio One's counsel was "replete with lumping," the bankruptcy court determined that "ten percent by amount of the offending entries [was] presumptively reasonable," and reduced the fee request accordingly. SA 1685.

14

The Seventh Circuit explained in *Harper v. City of Chicago Heights*, 223 F.3d 593, 605 (7th Cir. 2000), that "when a fee petition is vague or inadequately documented, a district court may either strike the problematic entries or (in recognition of the impracticalities of requiring courts to do an item-by-item accounting) reduce the proposed fee by a reasonable percentage. . . . Whichever option the district court chooses, it is required to provide a concise but clear explanation of its reasons for the fee award that is sufficient to permit appellate review." *Id.* (quotation marks and citation omitted).

DMP and Tucci contend that the bankruptcy court "gave no basis for its general application of a 10% reduction." DMP's Opening Br. at 22. But the bankruptcy court explained that a 10% reduction was "customar[y]" for a timesheet containing block-billed entries, and cited to cases where other courts imposed such a penalty. SA 1684–85. *See In re Rockford Prods. Corp.*, No. 07-71768, 2009 WL 2707236, at *7 (Bankr. N.D. Ill. Aug. 24, 2009); *Poynor v. Cmty. Unit Sch. Dist. #800*, No. 99 C 1290, 1999 WL 1101566, at *1 (N.D. Ill. Nov. 30, 1999); *In re Waterscape Resort LLC*, No. 11-11593(SMB), 2015 WL 289812, at *14 (Bankr. S.D.N.Y. Jan. 21, 2015); *In re Bean*, No. 04-34850, 2007 WL 81795, at *10 (Bankr. E.D. Tenn. Jan. 8, 2007); *In re Auto. Warranty Corp.*, 138 B.R. 72, 77 (Bankr. D. Colo. 1991). This adequately explains the bankruptcy court's decision to reduce the offending fees by 10%.

DMP and Tucci argue that other courts have applied larger reductions for block-billing, including reductions of up to 50%. But the amount by which fees should be reduced for block-billing is a matter of discretion, and DMP and Tucci have failed to show that the bankruptcy court abused that discretion in determining that 10% was appropriate in this case. As demonstrated by the decisions cited by the bankruptcy court and by other cases decided in this district, *see, e.g.*,

*Reyes v. Nations Title Agency of Ill., Inc.*, No. 00 C 7763, 2001 WL 687451, at *2 (N.D. Ill. June 19, 2001), a 10% reduction is often applied to fee requests where block-billing is a concern.

## IV.     Joint and Several Liability

Finally, DMP and Tucci contend that the bankruptcy court erred in holding them jointly and severally liable for the violations of the Cash Collateral Orders. They argue that the bankruptcy court should have made "specific findings regarding Tucci's conduct in relation to the 211 transactions raised by Radio One in its motion." DMP's Reply Br. at 24. Radio One naturally disagrees, arguing that the bankruptcy court correctly concluded that each party was individually liable.

Joint and several liability is appropriate when each party appears individually liable for the damages in question. *Lightspeed Media Corp. v. Smith*, 761 F.3d 699, 709–10 (7th Cir. 2014). And an individual who is "responsible for a corporation's compliance with a court order . . . may be punished for contempt if he fails to act appropriately." *Tranzact Techs. v. 1Source Worldsite*, 406 F.3d 851, 856 (7th Cir. 2005).

Here, there was ample evidence supporting the bankruptcy court's determination that Tucci and DMP were each liable for violations of the Cash Collateral Orders. Tucci was the president of DMP prior to and throughout the pendency of the bankruptcy case. SA 731. Tucci served as DMP's representative at the § 341 meeting of its creditors, as well as in two Rule 2004 examinations. SA 733–34. And, the bankruptcy court rightly pointed out, Tucci testified in those examinations that he had signed and submitted financial reports to the bankruptcy court that he knew to be inaccurate. SA 734. The court went on to describe numerous transfers between DMP, Tucci, and affiliated entities in which Tucci had an ownership interest—all of which occurred after

the filing of the bankruptcy petition, and a number of which occurred after the entry of the Cash Collateral Orders, which restricted the ability to make such transfers. SA 735–36.

Contrary to DMP's and Tucci's position that the bankruptcy court failed to consider what Tucci knew about these transfers, the court in fact concluded that Tucci had "personally performed" the actions that caused DMP to violate the Cash Collateral Orders. SA 742. As the "officer responsible for DMP's compliance," the court concluded, Tucci could be held individually liable for DMP's failure to "act[] in a manner consistent with its obligations as a debtor." *Id*. This determination is supported by Tucci's own testimony; for instance, he testified that all wire transfers were approved by him. SA 1596 at 39:8–12. In light of the evidence that Tucci was the decisionmaker at DMP, it was not error for the bankruptcy court to hold the two contemptors jointly and severally liable.

## Conclusion

For the reasons stated herein, the decision of the bankruptcy court is affirmed. Civil case terminated.

**IT IS SO ORDERED.**          **ENTERED: 9/23/19**

*[signature: John Z. Lee]*

_____

**John Z. Lee**
**United States District Judge**